IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

JACKIE McDOWELL, et al., :
:
Plaintiffs, :
v. : C.A. No. 97-2302
:
PHILADELPHIA HOUSING AUTHORITY, et al., :
:
Defendants. :

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE PHILADELPHIA HOUSING AUTHORITY TO VACATE CONSENT DECREE

The Philadelphia Housing Authority ("PHA") moves this Court to vacate a consent decree (the "McDowell Consent Decree") entered in January 1998, which requires PHA to increase gas utility allowances to residents of PHA's scattered-site housing if a change in gas rates equals or exceeds 10 percent. The McDowell Consent Decree was designed to prevent violations of 24 C.F.R § 965.507, and closely tracked the language of the regulation. That regulation, however, no longer applies to PHA.

Since the entry of the McDowell Consent Decree, the law governing public housing authorities has changed significantly. In 1996, Congress, in an effort to permit flexibility in the design of public housing programs, enacted the Public Housing Moving to Work Demonstration Statute (the "MTW Statute"). See 42 U.S.C.A. § 1437f notes. Under this statute, public housing authorities, with the permission and approval of the Department of Housing and Urban Development ("HUD"), can combine federal funding from various public housing programs and fashion new programs to suit the individual needs of the housing authority. The housing authority programs created under the MTW Statute ("MTW Programs") are not subject to the

provisions of the Code of Federal Regulations ("C.F.R."), but rather are evaluated by HUD plan by plan, housing authority by housing authority. In 2001, PHA was selected as a Moving to Work ("MTW") authority and, as an MTW authority, PHA enjoys flexibility in fashioning its public housing programs. That flexibility includes the power to set utility allowances for PHA residents.

This fundamental change in the law governing PHA warrants vacating the consent decree. The MTW Statute, the application of which to PHA came after the McDowell Consent Decree, has fundamentally changed HUD oversight of PHA to make permissible what the consent decree was designed to prevent: variance from regulations that hinder PHA's MTW Program. Philadelphia's MTW Program, instead of blindly adhering to the C.F.R., encourages tenant energy conservation and budgeting to fulfill the MTW statute's goal of economic self-sufficiency. The Consent Decree, accordingly, should be vacated.

## FACTS

A. <u>History of This Litigation and the Consent Decree</u>

In 1997, a group of PHA residents ("Tenants") filed a class action lawsuit alleging that PHA had not complied with HUD regulations governing adjustments to utility allowances for public housing residents. Specifically, plaintiffs alleged that PHA failed to adjust utility allowances after a gas rate change in excess of 10 percent in accordance with 24 C.F.R. § 965.507(a). Before any adjudication, and without any admission of liability by PHA, the parties entered into a stipulation of settlement (the "Stipulation"). The Stipulation is attached as Ex. A. On January 12, 1998, the Court entered an order that incorporated the terms of the

Stipulation (the order and Stipulation, collectively, the "Consent Decree").[1] The January 12, 1998, order is attached as Ex. B. In the Stipulation:

1. PHA agreed to increase all utility allowance payments from April 1, 1997, to reflect an increase in gas rates of approximately 17 percent, a rate the parties refer to as the "McDowell Baseline Rate." (Stipulation at ¶ 3.)

2. PHA agreed to provide retroactive gas utility allowance adjustments, based upon the McDowell Baseline Rate, for the period starting October 1, 1996. (Stipulation at ¶ 4.)

3. The parties agreed that PHA could revise its utility allowances if there was a gas utility rate change, and that PHA would revise its utility "allowances for resident-purchased utilities between annual reviews if any change in utility rates, by itself or together with prior rate changes not adjusted for, results in a change of 10 percent or more from the rate upon which the allowances were based." (Stipulation at ¶ 8.)

The provisions of the Stipulation closely tracked the provisions of HUD's utility allowance regulations:

> *Revision as a result of rate changes.* The PHA may revise its allowances for resident-purchased utilities between annual reviews if there is a rate change (including fuel adjustments) and shall be required to do so if such change, by itself or together with prior rate changes not adjusted for, results in a change of 10 percent or more from the rates on which such allowances were passed . . . .

24 C.F.R. § 965.507 (b).

PHA promptly complied with the provisions of the Stipulation that could be implemented immediately. After the entry of the Consent Decree, PHA increased utility allowances by approximately 17 percent to reflect the baseline gas rate of .87717/ccf[2] established

---

[1] Paragraph 17 of the Stipulation provides that "the defendants admit no liability and settle the claims solely for the purpose of terminating this dispute and litigation between the parties."

[2] "Ccf" is the abbreviation for one hundred cubic feet, a standard gas measurement.

in the Consent Decree. PHA also provided residents with retroactive gas utility allowance adjustments to account for increased gas rates for the period starting October 1996 and ending with the Consent Decree.

Rates were relatively stable from the entry of the Consent Decree in January 1998 until November 2000. A period of unstable gas rates followed, during which PHA fell out of compliance with the Consent Decree. On October 30, 2002, plaintiffs filed a Motion for Contempt and for Sanctions against PHA.

PHA made significant efforts to comply with the Consent Decree, and by January 1, 2003, PHA was in full compliance. See Order of J. Fullam, Mar. 9, 2004, ¶ 1, attached as Ex. C. PHA also engaged Sud Associates, Inc. ("Sud Associates"), to perform a consumption analysis in accordance with the HUD Utility Allowance Guidebook. See Sud Report at Exhibit B of Sur-Reply of Def. the Philadelphia Housing Authority in Opposition to Mot. to Compel Compl. and for Sanctions ("Def. Sur-Reply"); HUD Utility Allowance Guidebook ("HUD Guidelines") at Exhibit C of Def. Sur-Reply. Sud Associates determined that the consumption figures PHA had been using since 1985 were grossly inflated when compared with actual gas consumption by the residents.

Because PHA's utility allowances had been based upon historical and outdated consumption calculations, PHA's utility allowances had been far higher and more generous than the HUD regulations required. In fact, PHA expended approximately $9.5 million in excess gas utility payments to Tenants, despite the increase in the gas utility rates. See Declaration of Ish Sud, ¶ 6, attached as Ex. D.

In March 2003, PHA sent a notice to all PHA residents who receive utility allowances explaining that PHA had lowered its gas utility allowances. The notice and comment period required by HUD regulations elapsed without substantive objection or comment from any residents or plaintiffs' counsel.

After extensive briefing and oral argument, this Court entered an order on March 9, 2004, which denied the Motion for Contempt. A copy of the order is attached as Ex. C. In the order, this Court found, in pertinent part, that:

1. Plaintiffs have suffered no actual provable injury, and therefore plaintiffs' request for retroactive monetary relief was denied (Order, ¶ 6).

2. Neither counsel for plaintiffs nor any individual member of the class, although afforded an opportunity, did not comment upon or challenge the revised gas consumption calculations (Order, ¶ 5).

Tenants have appealed this order to the Court of Appeals for the Third Circuit.

B. Change in Governing Law – Moving to Work

In 1996, Congress enacted a new approach to public housing: the Moving to Work Demonstration. Under the MTW Statute, housing authorities and HUD were given the flexibility to design and test various approaches for providing and administering housing assistance with an aim toward reducing costs and achieving greater cost efficiency in federal expenditures. See 42 U.S.C. 1437f notes, attached as Ex. E. Housing authorities must apply and be selected for the MTW demonstration by the Secretary of HUD. 42 U.S.C. 1437f notes, (c). Once a housing authority is selected as an MTW agency, the housing authority and HUD enter into a written agreement. That agreement outlines the housing authority's flexibility in constructing a MTW Program. Annually, a housing authority submits a plan, which also requires approval by the Secretary of HUD, that describes that housing authority's annual MTW

Program for the provision of housing assistance. See 42 U.S.C. 1437f notes, (b). Under the MTW program, the housing authority enjoys freedom from statutes governing public housing, and the regulations arising from those statutes.[3] See 42 U.S.C. 1437f notes, (b) & (e). The MTW Statute, together with 42 U.S.C. § 3535, allow the Secretary of HUD to waive HUD regulations so that housing authorities can implement programs to provide public housing to better suit the needs of an individual housing authority's residents and constituents. See 42 U.S.C. § 3535 ("Any waiver of regulations of the Department shall be in writing and shall specify the grounds for approving the waiver . . . The Secretary may delegate authority to approve a waiver . . . .)

On April 1, 2001, three years after the entry of the McDowell Consent Decree, HUD accepted PHA into the MTW program. See MTW Demonstration Agreement ("MTW Agreement") attached as Ex. F. ("The term of this Agreement shall be retroactive to April 1, 2001 . . . .") The MTW Agreement states:

> Except as expressly provided in this Agreement, this Agreement supersedes the terms and conditions of the ACCs [annual contribution contracts between housing authorities and HUD][4] and the provisions of the United States Housing Act of 1937 (the "1937 Act") and HUD requirements to the extent necessary for the Agency to implement its MTW demonstration, as approved by HUD in this Agreement.

---

[3] The MTW Statute states that that 42 U.S.C.A. § 1437p (demolition of public housing) and certain sections of 1437j (labor standards and community service requirement) continue to apply even to an MTW housing authority. Neither of these sections apply in this case. See 42 U.S.C.A. § 1437f notes, (e).

[4] Annual Contribution Contracts ("ACCs") set forth the terms and conditions under which a housing authority participates in the public housing and/or Section 8 certificate and voucher programs administered by HUD. See MTW Agreement, preamble. ACCs are superseded by the MTW Agreement. MTW Ag., Art. I A.

MTW Agreement, Art. I A (emphasis added). The MTW Agreement also allows PHA to determine the standards for utility allowances. See MTW Agreement, Art. I I.

Under the MTW Agreement, a lump sum is given to PHA to administer its MTW Program. See MTW Agreement, Attachment A, p.19. HUD has not provided, and is not expected to provide, additional funding for increases in utility rates.

C. Changes in Gas Utility Rates

Since the entry of the McDowell Consent Decree, gas rates have changed by 10 percent or more numerous times. In fact, in the past year alone there have been three changes of 10 percent or more (two increases and one decrease). To combat the gas utility rate increases, PHA is incorporating a goal of conservation into its MTW Plan. Tenants have admitted that public housing residents use more gas than the average users. See Pl. Reply Brf. in Support of Mot. to Enforce Consent Decree, at p. 14 ("PHA tenants generally consume more gas than PGW's 'average' residential customer . . . .") By encouraging residents to conserve utilities during times of rate increases, PHA is able to fulfill the Congressional goals of MTW: moving tenants towards economic self-sufficiency by learning both utility conservation and budgeting techniques. 42 U.S.C.A § 1437f notes. Through encouraging conservation, instead of the traditional C.F.R. approach of continuously meeting increasing rates and absorbing higher than average consumption, PHA is able to free funds to provide better housing choices to tenants and other innovative MTW programs.

# ARGUMENT

A. The Law Has Changed Significantly, Warranting Vacatur of the Consent Decree in this Action

1. *The Standards and Grounds for Modification and Vacatur of Consent Decrees*

Rule 60(b) of the Federal Rules of Civil Procedure governs vacatur of consent decrees and provides:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60(b). This right to seek modification, and the power of the court to modify or vacate a judgment or order, applies equally to consent decrees. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-83 (1992); Evans v. City of Chicago, 10 F.3d 474, 476 (7th Cir. 1993), cert. denied, 511 U.S. 1082 (1994).

The requirements of Rule 60(b) are satisfied and modification or vacatur of a consent decree should be granted where it is shown that there has been a significant change in either the law or the facts on which the consent decree was predicated. Rufo, 502 U.S. at 383-90; Brown v. Philadelphia Housing Authority, 350 F.3d 338, 348 n.6 (3d Cir. 2003); Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 184 (3d Cir. 1999); Gilmore v. Housing Authority of Baltimore City, 170 F.3d 428, 430 (4th Cir. 1999); King v. Greenblatt, 52 F.3d 1, 4 (1st Cir. 1995); Sweeton v. Brown, 27 F.3d 1162, 1166 (6th Cir. 1994), cert. denied, 513 U.S. 1158 (1995).

"A party seeking modification of a consent decree may meet its initial burden by showing . . . a significant change either in factual conditions or in law . . . ." Rufo, 502 U.S. at

384, 388. To modify or vacate a consent decree, the court must determine whether: (1) there has been a significant change in the law or facts; and (2) if so, that the proposed modification of the decree is "suitably tailored to the changed circumstance." Id. at 383.

Although pre-Rufo jurisprudence dictated that an actual conflict arise between the new law and the old law before modification or vacatur of an order under Rule 60(b), courts since have held that no conflict with subsequent law need be shown for modification or vacatur of a consent decree to be appropriate. Brown, 350 F.3d at 348 n.6. The Third Circuit made clear in Brown, where it reversed the district court's refusal to vacate a consent decree, that:

> Under the teachings found in Building & Construction Trades Council v. NLRB, 64 F.3d 880 (3d Cir. 1995) and Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992), there need not be a 'conflict' to justify vacatur of a consent decree; a 'significant change' with no attendant conflict constitutes sufficient grounds for vacatur.

Brown, 350 F.3d at 348 n.6.

Modifying and vacating consent decrees in response to changes in the law or facts is particularly appropriate where litigation regarding the reform of institutions regulated by a government agency and court regulation of a government agency are involved. Frew v. Hawkins, 124 S.Ct. 899, 905-06 (2004); Rufo, 502 U.S. at 380-81, 392; Harris v. City of Philadelphia, 47 F.3d 1311, 1331 (3d Cir. 1995); King, 52 F.3d at 4. See also Building & Construction Trades Council v. NLRB, 64 F.3d 880, 888 (3d Cir. 1995). The Third Circuit has recognized:

> [d]ecrees of this sort are 'not intended to operate in perpetuity'. . . [B]ecause consent decrees in institutional reform litigation often remain in place for extended periods of time, 'the likelihood of significant changes occurring during the life of the decree is increased.'

Harris, 47 F.3d at 1331 (quoting Board of Education v. Dowell, 498 U.S. 237 (1991), and Rufo, 502 U.S. 367).

In Building & Construction Trades Council, the Third Circuit enumerated factors to aid courts in their consideration of a motion to modify or vacate a consent decree. These factors include:

    (1)    the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented;

    (2)    the length of time since entry of the injunction;

    (3)    the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction;

    (4)    whether conduct previously enjoined has become legal due to a change in the law;

    (5)    whether the objective of the decree has been achieved; and

    (6)    whether continued enforcement would be detrimental to the public interest, including the interest of federalism in eliminating unnecessary federal court supervision of state institutions.

Building & Construction Trades Council, 64 F.3d at 888.

A district court errs when it fails to vacate a consent decree where subsequent regulations supersede the need for court regulation. Brown, 350 F.3d at 348 n.6.

As demonstrated below, under Rufo and Building & Construction Trades Council, the Consent Decree should be vacated.

### 2. Moving to Work Constitutes a Significant Change in Law That Warrants Vacatur of this Consent Decree

Precisely the type of significant change in law contemplated by Rufo has occurred since the McDowell Consent Decree. In 2001, when PHA was accepted as a MTW agency, HUD regulations, including those governing utility allowances, no longer applied to PHA. Instead, PHA is now afforded flexibility to create a new program for utilities – one that emphasizes conservation and budgeting to promote the Congressional MTW goal of economic self-sufficiency. The need for a judicial order to remedy and prevent violations of the HUD regulations that govern utility allowances has been explicitly superseded and eliminated by the federal MTW statute and the MTW Agreement between HUD and PHA. See 42 U.S.C. § 1437f notes, (b) & (e) (explaining program authority and the two provisions of the Housing Act of 1937 that remain in force despite the enactment of the MTW Statute[5]); 42 U.S.C. § 3535 (allowing the HUD Secretary to waive HUD regulations); PHA's MTW Agreement, Art. I, A (providing that HUD regulations, which include utility allowance requirements, do not apply to PHA's MTW Program). The MTW Statute makes moot any purported violation of the utility allowance structure in 24 C.F.R. § 965.507 (b) because PHA is now allowed the flexibility to set standards for utility allowances without the guidance of the C.F.R.: MTW "supersedes the terms and conditions of . . . the provisions of the United States Housing Act of 1937 (the '1937 Act') and HUD requirements . . . ." MTW Agreement, Art. I A. (The HUD regulations codified at 24 C.F.R. § 965.507 (b) were promulgated under the 1937 Act. See 24 C.F.R. § 965, General Provisions.) Furthermore, the MTW Agreement allows PHA to

---

[5] Neither provision applies to this motion.

determine the standards for utility allowances, see MTW Agreement, Art. II, MTW, thus, supersedes 24 C.F.R. § 965.507 (b) (providing for utility allowances revisions).

The Third Circuit is clear: "[W]hen Congress changes the law underlying a judgment awarding prospective injunctive relief, the judgment becomes void to the extent that it is inconsistent with the amended law." Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 184 (3d Cir. 1999). Congress has changed the law regarding the implementation of utility allowances. The establishment and revision of gas utility allowances (the violation of the C.F.R. that the McDowell Consent Decree was designed to remedy) is no longer governed by the C.F.R.; MTW now gives PHA the flexibility to set its own utility allowances without the controlling hand of HUD. See id. (holding that a consent decree may be modified "when the statutory or decisional law has changed to make legal what the decree was designed to prevent" (internal citations and quotations omitted)).

In Brown, the Third Circuit held that where a federal statute and HUD regulations have addressed the same needs and issues as a public housing consent decree and provide procedural protections for the same situation as the consent decree, that constitutes a significant change that renders the consent decree unnecessary and requires its vacatur. In Brown, a consent decree was entered in 1974, which required PHA to provide grievance hearings to its tenants before they were evicted from its housing. 350 F.3d at 341. In 1975 and 1991, HUD promulgated regulations requiring grievance hearings and establishing the procedural requirements for those hearings. 350 F.3d at 341-42 n.2. The district court in Brown refused to vacate the consent decree because the decree did not require PHA to violate federal law and therefore did not conflict with federal law. 237 F. Supp. 2d 567, 571, 573-77 (E.D. Pa. 2002).

The Third Circuit reversed that ruling and ordered the district court to vacate the consent decree and dismiss the action. 350 F.3d at 347-48. The primary basis for the Third Circuit's decision in Brown was that the action was moot because no class had been certified. 350 F.3d at 347. The court, however, also addressed the merits "because we believe that some guidance should be afforded to the bench and bar pertaining to the test for determining when a court ordered decree challenged under Rule 60(b) should be set aside as having lost its utility." 350 F.3d at 348 n.6.

Addressing the merits, the Third Circuit court in Brown expressly reversed the district court and held that conflict with subsequent law is not a prerequisite to vacatur of a consent decree. 350 F.3d at 348 n.6. Moreover, the Third Circuit also specifically held that the consent decree should have been vacated, even if it were not moot, because the federal regulations and federal statute superseded the need for court regulation. 350 F.3d at 348 n.6. The Third Circuit in Brown concluded that the existence of federally prescribed grievance hearing procedures "significantly change[d] the relevant due process landscape (originally sought to be cured by the Consent Decree)," and that, as a result, "the Consent Decree no longer had force or utility, and there was no reason for the Consent Decree to remain operative." 350 F.3d at 348 n.6.

In Gilmore, the Fourth Circuit affirmed the vacation of a consent decree entered against the Housing Authority of Baltimore City. See Gilmore, 170 F.3d at 431. Under federal law at the time of the consent decree, a housing authority was required to provide tenants with administrative grievance hearings regarding lease terminations. Six years later, Congress modified the law which allowed the housing authority to remove the right to an administrative hearing in certain cases. See id. at 429-430. The court held, "[B]ecause the statutory

administrative hearing requirements that the consent decree was originally entered to protect no longer existed, the consent decree was simply no longer necessary." Id. at 430.

Similar to Brown and Gilmore, the C.F.R. provision governing the revisions of utility allowances no longer applies to PHA now that PHA is an MTW housing authority. MTW significantly changed the landscape in which housing authorities operate. Because the regulations that the McDowell Consent Decree was originally entered to enforce, the revision of utility allowances under the C.F.R., no longer exists, the Consent Decree simply is no longer necessary.

   3. *Vacating of the Consent Decree is Supported by Construction Trades Factors*

The factors the Third Circuit adopted in Building & Construction Trades Council v. NLRB as considerations favoring modifying or vacating an injunction also support the vacating of the McDowell Consent Decree.[6] The factors are: the length of time since the entry of the injunction; the circumstances leading to the entry and the nature of the conduct sought to be prevented; the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction; whether conduct previously enjoined has become legal due to a change in the law; whether the objective of the decree has been achieved; and whether continued enforcement would be detrimental to the public interest (including the interest of federalism in

---

[6] Although the Third Circuit did not vacate the consent decree in Building & Construction Trades, there was no change in the law underlying the consent decree, as there is in this motion to vacate the McDowell Consent Decree. See Building & Construction Trades, 64 F.3d at 883. In addition, unlike in this case, the Third Circuit held that there was no showing of changed circumstances effecting the consent decree. See id. at 891.

eliminating unnecessary federal court supervision of state institutions). Building & Construction Trades, 64 F.3d at 888.

The length of time since the entry of the Consent Decree is almost eight years, enough time for the law from which the Consent Decree arose to drastically change. See also Rufo, 502 US at 376 (allowing a first modification six years after consent decree, and a second modification four years later). The circumstance leading to the entry of the Consent Decree, PHA's non-compliance with the C.F.R., no longer applies since MTW has superseded the C.F.R. with respect to utility allowances. Although Tenants did move to enforce the Consent Decree, there was no actual need for any court enforcement from the entry of the Consent Decree in 1998 to March 2004 (the entry of this Court's Order), as this Court found that "members of the class have not suffered any actual provable injury as a result of any failure of PHA to comply with the Consent Decree." See March 9, 2004 Order, at ¶ 6, attached as Ex. B. In fact, from 1998 to 2003, the Tenants enjoyed a gas utility allowance windfall of almost $9.5 million dollars. See Declaration of Ish Sud, ¶ 6, at Ex. D. There is no likelihood of a future violation of the C.F.R. regarding gas utility allowance revisions due to the fact that MTW superseded the regulations; and thus there is no need for a court order to achieve the objective of the McDowell Consent Decree, given the unambiguous and binding federal statutes that specifically allow new utility allowance procedures.

Finally, the interests of federalism in eliminating unnecessary federal court supervision and management of state and local agencies support termination of this consent decree as the need and basis for court supervision are gone. Building & Construction Trades, 64 F.3d at 888; see also Frew, 124 S.Ct. at 905-06; Brown, 350 F.3d. at 348 n.6; Harris, 47 F.3d at 1331. This

Court no longer needs to enforce the C.F.R., as the MTW Agreement now governs utility allowances.

### 4. Vacating of the Consent Decree is a Proper Remedy

Once it is established that there has been a significant change in the law, a party seeking vacatur of an order must show that the proposed modification of the decree is "suitably tailored to the changed circumstance." Rufo, 502 U.S. at 383. Where there is no longer a purpose or basis for the consent decree itself, the modification most "suitably tailored to the changed circumstance," Rufo, 502 U.S. at 391, is the vacating of the consent decree in its entirety. Brown, 350 F.3d at 348 n.6; Gilmore, 170 F.3d at 430. As the MTW Statute supersedes the HUD regulations codified in the C.F.R., and the McDowell Consent Decree was designed to enforce compliance with the C.F.R. regarding gas utility allowances, the Consent Decree is "simply no longer necessary," should be vacated in its entirety, and this action should be dismissed.

## CONCLUSION

Under MTW, with the ability to combine funding and modify programs, PHA is able to design a utility allowance that meets the MTW goals of reducing costs, achieving greater cost effectiveness, and promoting economic self-sufficiency, in addition to encouraging gas utility conservation and budgeting by its Tenants. As Congress has recognized, allowing housing authorities to take creative approaches to public assistance will increase housing choices for low-income families. See 42 U.S.C. § 1437f notes. Binding PHA to a federal regulation that no longer applies, and to regulations that Congress has realized may unduly restrict a Moving to Work housing authority, serves no logical purpose.

As there is no longer a purpose or basis for the McDowell Consent Decree, the decree should be vacated.

Respectfully submitted,

*[signature]*

Alan C. Kessler (I.D. No. 22230)
Abbe F. Fletman (I.D. No. 52896)
Stephanie L. Kosta (I.D. No. 89656)

Attorneys for Defendant
The Philadelphia Housing Authority

Of counsel:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097
(215) 977-2000

Dated: March 9, 2005