IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JACKIE McDOWELL, et al.,<br>       Plaintiffs,<br>v.<br>THE PHILADELPHIA HOUSING AUTHORITY, et al.,<br>       Defendants. | CIVIL ACTION<br><br>NO. 97-2302 |

**THE PHILADELPHIA HOUSING AUTHORITY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING ITS MOTION TO VACATE CONSENT DECREE**

**PROPOSED FINDINGS OF FACT**

**A. Background**

  1. Defendant, the Philadelphia Housing Authority ("PHA"), is a Commonwealth agency established pursuant to 35 Pa. Cons. Stat. § 1541, *et seq*.

  2. Among other assistance, PHA provides a cash allowance, or a credit against rent, to public housing residents who pay their own gas and electricity bills directly to their utility suppliers. This is known as a utility allowance. *See* Transcript of Hearing volume I, 41:25-42:3, 58:23-59:20 ("Tr. v., I")[1].

---

[1] A clerical error led to the hearing transcripts being incorrectly labeled. The parties have agreed upon a method for uniformly citing to the transcripts, by labeling the transcripts as volumes I through VI in chronological order. To aid the Court in its review of the hearing materials, the parties will jointly submit a binder presenting the transcripts in such order.

3. The plaintiff class is a group of residents residing in PHA scattered-site housing receiving utility allowances from PHA ("plaintiffs").

**B.     McDowell Consent Decree**

4. In 1997, plaintiffs filed a class action lawsuit alleging that PHA had not complied with HUD regulations governing adjustments to utility allowances for public housing residents.

5. PHA and plaintiffs entered into a stipulation of settlement, and on January 12, 1998, this Court entered a consent decree that incorporated the terms of the Stipulation (the "Consent Decree").

6. Mirroring the regulations of the United States Department of Housing and Urban Development ("HUD"), as codified in the Code of Federal Regulations, the Consent Decree stated that PHA would revise its utility allowances if there was a natural gas rate change that, by itself or together with rate changes not previously adjusted for, resulted in a change of 10 percent or more from the rate upon which the allowances were then based.

**C.     Moving to Work Demonstration Agreement**

7. In 1996, Congress enacted a new approach to public housing: the Public Housing Moving to Work Demonstration, codified at 42 U.S.C. 1437f notes ("MTW Statute"). *See* Tr. v. I, 25:2-12.

8. Under the MTW Statute, housing authorities and HUD were given the flexibility to design and test various approaches for providing and administering housing assistance with an aim toward reducing costs and achieving greater cost efficiency in federal expenditures. *See* 42 U.S.C. 1437f notes; Tr. v. I, 25:2-12.

9. Housing authorities must apply and be selected for the Moving to Work ("MTW") demonstration by the Secretary of HUD. *See* 42 U.S.C. 1437f notes, (c); Tr. v. I, 24:5-16.

10. There are currently only 32 Moving to Work agencies. *See* Tr. v. I, 24:7-8.

11. Once a housing authority is selected as an MTW agency, the authority and HUD enter into a written agreement, called an MTW agreement. *See* Tr. v. I, 29:19-24. An MTW agreement specifies the terms and conditions of the agency's participation in the MTW Demonstration. *Id.*

12. Annually, a housing authority submits a plan that describes that authority's annual MTW Program for the provision of housing assistance. *See* 42 U.S.C. 1437f notes, (b); *see also* Tr. v. I, 30:11-15.

13. Under the MTW Demonstration, the housing authority enjoys freedom from most statutes governing public housing and the regulations arising from those statutes. *See* 42 U.S.C. 1437f notes, (b) & (e).

14. On April 1, 2001, three years after the entry of the McDowell Consent Decree, HUD accepted PHA into the MTW Demonstration. *See* Defendant's Ex. 4; *see also* Tr. v. I, 30:20-31:1.

15. As is required of MTW agencies, PHA entered into the MTW Demonstration Agreement ("MTW Agreement") on February 28, 2002, but the MTW Agreement was effective retroactive to April 1, 2001. *See* Tr. v. I, 30:20-31:1.

16. PHA's MTW Agreement states:

> Except as expressly provided in this Agreement, this Agreement *supersedes* the terms and conditions of the ACCs [annual

contribution contracts between housing authorities and HUD] and the provisions of the United States Housing Act of 1937 (the "1937 Act") and HUD requirements to the extent necessary for the Agency to implement its MTW demonstration, as approved by HUD in this Agreement.

*See* Defendant's Ex. 4, at Art. I A (emphasis added).

17. PHA's MTW Agreement also states,

[PHA] may adopt and implement any reasonable policies for setting rents for public housing or *rents or subsidy levels* for tenant-based assistance, not withstanding the U.S. Housing Act of 1937, provided that the Agency submits the policy to HUD annually and upon any material change to the policy and provided that:

1. [PHA] must submit the new utility allowance program to HUD;

2. [PHA's] board must approve the new program and approve an analysis of the impact of the program on current households, and on households on the waiting list, including an analysis of the severity of rent burdens on such households that would have rent burdens greater than 30 percent of adjusted income;

3. [PHA] must adopt a policy for addressing hardship cases under the new program;

4. [PHA] must provide a reasonable transition period for existing residents; and

5. A public hearing must be held regarding the new program.

*See* Defendant's Ex. 4, at Art. I I (emphasis added).

18. The language in Art. I I of PHA's MTW Agreement is substantially similar to MTW agreements for several other public housing authorities enrolled in the MTW program, including: the Housing Authority of Tulare County; the Keene Housing Authority; the Delaware State Housing Authority; the San Diego Housing Commission. *See* Defendant's Exs. 39-41, 61, at Art. I I; Tr. v. I, 23:18-21, 23:24-4, & 37:1-38:10.

19. In each of those cases, HUD has approved the revision or elimination of utility allowance programs in the implementation of the public housing authorities MTW program. *See* Defendant's Exs. 39-41, 61, at Art. I I; Tr. v. I, 23:18-21, 23:24-4, & 37:1-38:10.

**D. Recent Increases in Natural Gas Rates.**

20. Prior to January 1998, there was a period of relative stability in natural gas rates. *See* Defendant's Ex. 49 (stipulated by parties). Between December 1994 and January 1998, there was only one increase in natural gas rates of 10 percent or more. *See* Defendant's Ex. 49.

21. However, since January 1998, natural gas rates have changed by 10 percent or more approximately 12 times. *See* Defendant's Ex. 49.

22. In fact, between June 1, 2005, and November 1, 2005, gas rates rose 38.28 percent (from 1.39027 per ccf to 1.92250 per ccf). *See* Defendant's Ex. 49.

23. Taking into account the latest increases in natural gas rates, since April 2002 natural gas rates have risen approximately 106.43 percent (from $0.9313 to $1.92250 per ccf). *See* Defendant's Ex. 49.

**E. PHA's Budget and HUD Funding**

24. The source of PHA's funding has not changed significantly since PHA's acceptance into the MTW program, as almost all of PHA's budget is derived from income received from two sources: HUD and rental income. *See* Tr. v. I, 67:15-68:7.

25. Prior to PHA's acceptance into the MTW program, HUD would subsidize any decreases in PHA's rental income as a result of an increase in utility allowance payments. *See* Tr. v. I, 61:23-62:23.

26. This was typically done through a year-end subsidy provided by HUD. *See* Defendant's Ex. 37; Tr. v. I, 61:23-63:6.

27. However, under PHA's MTW Agreement, HUD does not subsidize PHA for increases in utility allowances. *See* Defendant's Exs. 36 & 37; Tr. v. I, 63:1-6.

28. In the past three years, HUD has not fully funded PHA's operating budget. *See* Tr. v. I, 66:16-67:10.

29. Most recently, in the current fiscal year, running April 1, 2005, to March 31, 2006, HUD only funded 88.8 percent of PHA's budget. This corresponds to approximately 12.5 million dollars requested in PHA's most recent budget that was not provided by HUD. *See* Tr. v. I, 66:16-67:1.

30. Increased utility allowances result both 1) in increased expenses and 2) in reduced revenues for PHA. *See* Tr. v. I, 61:2-63:6. Utility allowances must be paid by PHA, resulting in increased expenses. In addition, if the utility allowance paid to an individual resident exceeds the amount of rent that PHA can charge the resident, this will also be reflected by a reduced rental revenue for PHA. *Id.*

31. PHA has requested additional funds from HUD to account for the dramatic increases in energy costs. S*ee* Defendant's Ex. 36; *see also* Tr. v. I, 69:15-70:14.

32. Recently, on November 25, 2005, PHA sent a letter to Secretary Alfonso Jackson, secretary of HUD. In the letter, PHA explained that it was "struggling to meet [the additional natural gas costs]" and requested additional funding. Defendant's Ex. 36; *see also* Tr. v. I, 69:15-70:14. HUD declined PHA's request. *See* Defendant's Ex. 37; *see also* Tr. v. I, 69:15-70:14.

33. Without additional funding, PHA will incur additional costs of more than $1.8 million annually if it is required to pay the natural gas rates that went into effect in the fall of 2005. *See* Tr. v. I, 65:16-20.[2]

34. This lack of funding may force across-the-board layoffs in PHA's workforce. As maintenance staff makes up a majority of PHA's workforce, this group will likely face the most severe layoffs. *See* Tr. v. I, 74:9-10, 74:25-75:13. In the event of such layoffs, the maintenance of all of PHA's housing stock, not just scattered-site units, will suffer. *See* Tr. v. I, 76:5-6.

35. Furthermore, there may be layoffs for managers at every site, including those in charge of the admissions and inspections, which would drastically slow the admissions process for new residents. *See* Tr. v. I, 75:15-24. There may also be layoffs for back offices, such as Informational Systems Management Department, causing backlogs in PHA's ability to post rent checks from its residents and in turn affecting the residents in terms of their ability to monitor their finances. *See* Tr. v. I, 75:15-24.

36. If there is a reduction in PHA's staff, all PHA residents will be affected, not just those living in scattered-site units. *See* Tr. v. I, 74:25-75:6, 76:5-6.

**F.   PHA's Maintenance Efforts**

37. PHA takes great efforts to ensure that its houses are in working order for PHA's residents. *See* Tr. v. V, 7:20-14:23.

---

[2]   Ms. Rosenthal testified that PHA stood to incur additional costs of $1.8 million as a result of the 19.4 percent natural gas rate increase effective November 1, 2005. However, the actual rate increase was 21.11 percent. *See* Defendant's Ex. 49. PHA additional costs will exceed the $1.8 million figure testified to at the hearing. *See* Tr. v. I, 65:16-20.

38. Plaintiffs presented testimony from a single scattered-site resident, Elizabeth Floyd, that the condition of her home was the cause of her high energy bills. *See* Tr. v. III, 20:7-28:1. PHA, however, demonstrated that PHA had made extensive renovations to Ms. Floyd's home over the last six years, including replacing her windows, roof, and heater. *See* Defendant's Ex. 69; Tr. v. V, 7:20-14:23.

39. It is PHA's practice when removing windows to replace them with thermal insulated double pane windows. After the windows are installed, PHA caps the wooden window frame, meaning that the frame is caulked and then metal is bent around the frame to seal the whole masonry opening between the window and the window frame to ensure that there is no leakage. During this process, any rotting wood is replaced or repaired. Tr. v. V, 12:11-13:15.

40. In addition, when a house receives a new roof, PHA places between two and four inches of hard insulation between the house and the roof. *See* Defendant's Ex. 69; Tr. v. V, 13:16-14:5.

41. PHA also installs electronic ignition gas ranges which are more efficient than the older gas ranges that relied upon a constantly lit pilot light. *See* Tr. v. IV, 14:6-14:13.

42. Finally, PHA installs Hyle Bryant heaters which are over 80 percent efficient heaters. *See* Tr. v. IV, 14:6-15:25.

43. All of PHA's standard procedures were followed on Ms. Floyd's house. *See* Defendant's Ex. 69; Tr. v. V, 6:23-14:23.

**G. Residents' Consumption and Conservation**

44. The average usage for a Philadelphia gas customer is 1,000 ccf per year. *See* Defendant's Ex. 25; Tr. v. II, 63:11-16.

45. In 2004, plaintiffs consumed 28.7 percent above the average usage of a Philadelphia PGW customer. *See* Defendant's Ex. 25; Tr. v. II, 16:18-17:13.

46. In 2004, the consumption portion of the utility allowance provided to plaintiffs was 52.4 percent above the average consumption of natural gas by Philadelphia PGW customers. *See* Defendant's Ex. 25; Tr. v. II, 16:18-17:13.

47. Further, a comparison to the engineering model conducted by Judith Mondre showed a 32 percent increase of actual consumption by plaintiffs over the expected usage for a scattered-site household. *See* Tr. v. II, 30:8-24.

48. Dr. Stephen Barnett, an expert in the field of cultural anthropology, conducted a survey of PHA scattered-site housing residents and found that an overwhelming majority of respondents had the motivation to conserve but lacked the information and knowledge to conserve effectively. *See* Tr. v. VI, 13:25-14:11.

## PROPOSED CONCLUSIONS OF LAW

PHA seeks relief from the Consent Decree under the theory that there has been a change in the facts, there has been a change in the law, and/or equity considerations, which warrant vacatur of the Consent Decree.

**A.  Change in Law**

49. The requirements of Rule 60(b) are satisfied and modification or vacatur of a consent decree should be granted where it is shown that there has been a significant change in the law or facts upon which the consent decree was predicated. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-90 (1992).

50. The Court concludes that PHA's acceptance into the MTW program in 2001, constituted a significant change in the law. Prior to entering into the Consent Decree, PHA's utility allowance formula was governed by the Code of Federal Regulations. *See* 24 C.F.R. § 965.507. The parties entered into a stipulation, which subsequently was entered as an Order of this Court on January 12, 1998, based upon PHA's obligations under HUD's utility allowance regulations. *Id.*

51. However, the Court holds that in its enactment of the MTW Statute, Congress demonstrated its intent to allow housing authorities and HUD the flexibility to design and test various approaches for providing and administering housing assistance with an aim of reducing costs and achieving greater cost efficiency in federal expenditures. *See* 42 U.S.C. 1437f notes. In furtherance of this, MTW agencies are no longer required to follow the Code of Federal Regulations, and instead be governed by their individual MTW Agreements.

52. The Court holds that there was a significant change in the law upon which the Consent Decree was based when HUD accepted PHA into the MTW program on April 1, 2001. At this point, PHA's MTW Agreement superseded PHA's obligations under the Code of Federal Regulations, including the section regarding utility allowances.

53. HUD interprets utility allowances to be considered part of the term "rents" under MTW Agreements. Accordingly, HUD has approved revisions to utility allowance programs of other MTW agencies with nearly identical language in their MTW Agreements as PHA's, including the Keene Housing Authority; the Delaware State Housing Authority; the Housing Authority of Tulare County; and the San Diego Housing Commission, as long as they comply with the steps for making material changes to rent policies listed in their MTW Agreements.

54. Plaintiffs argue that PHA's entrance into the MTW Program was elective and PHA should be barred from requesting vactur or modification of the Consent Decree. However, under *Rufo*, it is of no consequence that the change in law was elective when vacating a consent decree. *Gilmore v. Housing Authority of Baltimore City*, 170 F.3d 428, 430 (4th Cir. 1999).

55. Plaintiffs also argue that the MTW program does not conflict with the Consent Decree and therefore vacatur is not necessary. It is unnecessary for PHA to prove that any future MTW allowance program be unworkable while the Consent Decree is still in operation, it is only necessary for PHA to prove that a significant change has occurred in the law. A significant change with no conflict between the change in law and the consent decree is sufficient to justify vacatur or modification of a consent decree. *Brown v. Philadelphia Hous. Auth.*, 350 F.3d 338, 348 n.6 (3d Cir. 2003) (relying upon *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) and *Building & Construction Trades Council v. NLRB*, 64 F.3d 880 (3d Cir. 1995)).

56. Nevertheless, this Court finds that such a conflict does exist. In the MTW program, Congress and HUD have relegated their authority over utility allowances to the local housing authority; however, the Consent Decree requires that one particular utility allowance policy, the one set forth in HUD regulations, be prolonged forever. The conflict arises in that the Consent Decree requires the implementation of a specific utility allowance; while the MTW Program allows the public housing authority options regarding utility allowances. Here, the conflict between the two laws is not just an unintentional effect of the change in the law, but rather is the *very purpose* of the change in the law.

**B.     Change in Facts**

57.     The requirements of Rule 60(b) can also be satisfied and modification or vacatur of a consent decree should be granted where it is shown that there has been a significant change in the facts on which the consent decree was predicated. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383-90 (1992).

58.     The Court holds that the substantial increases in natural gas rates constitute a significant change in facts upon which the Consent Decree was based. The Court also holds that the parties could not have reasonably foreseen that such volatility in natural gas prices would occur. There is no dispute that between 1994 and January 1998, there was only one increase in natural gas rates of 10 percent or more. In comparison, since January 1998, natural gas rates have changed by 10 percent or more approximately 12 times. Since April 2002, natural gas rates have increased approximately 106.43 percent.

59.     The Court also holds that at the time the parties entered into the Consent Decree, PHA could not have reasonably foreseen that PHA would be invited into the MTW Demonstration. There is no dispute that currently there are only 32 MTW agencies, which make up a fraction of the total public housing authorities in the United States.

60.     The Court holds that PHA could not have reasonably conceived at the time that time that it entered into the Consent Decree that residents would also systematically fail to conserve. Class members consistently use gas allowance well in excess of the average usage for PGW customers, which is approximately 1,000 ccf per year.

### C. The Consent Decree is No Longer Equitable

61. Consent decrees should also be vacated or modified when the decree is no longer equitable. FED. R. CIV. PRO. 60(b)(5).

62. The Court holds that PHA has a limited budget, which is not being supplemented by HUD to account for the increases in natural gas rates.

63. The Court also holds that plaintiffs are substantially over-consuming natural gas. In 2004, plaintiffs consumed 28.7 percent above the average consumption of gas by Philadelphia PGW customers. In 2004, the utility allowance consumption was 52.4 percent above the average usage by Philadelphia PGW customers. Further, a comparison to the engineering model shows a 32 percent increase of consumption over the expected usage for scatter-site households.

64. In light of the dramatic increases in natural gas rates and HUD's inability to subsidize PHA, continuing to enforce the terms of the Consent Decree will likely harm *all* PHA residents by forcing PHA to institute across-the-board layoffs. As a result the Court finds that the Consent Decree is no longer equitable and should be vacated.

### D. Vacatur is Suitably Tailored to the Consent Decree.

65. The proposed modification of the decree must be suitably tailored to the changed circumstance. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 391 (1992).

66. Given that the purpose of the Consent Decree was to enforce the federal regulations, which are no longer applicable to PHA since it entered the MTW program, the purpose of the Consent Decree is frustrated and vacatur of the Consent Decree is proper upon HUD's acceptance of a new MTW policy for PHA.

Respectfully submitted,

_____/s/ slk6630_____
Alan C. Kessler (I.D. No. 22230)
Brian P. Flaherty (I.D. No. 28235)
Stephanie L. Kosta (I.D. No. 89656)

Attorneys for Defendant,
the Philadelphia Housing Authority

Of counsel:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097
(215) 977-2000

Dated: March 27, 2006

# CERTIFICATE OF SERVICE

I, Stephanie L. Kosta, hereby certify that on the date noted below I caused a true and correct copy of The Philadelphia Housing Authority's Proposed Findings of Fact and Conclusions of Law to be served electronically and via first class mail upon:

>Paul A. Brooks, Esquire
>Community Legal Services
>1424 Chestnut Street
>Philadelphia, PA   19102

/s/  slk6630
Stephanie L. Kosta

Dated:   March 27, 2006